**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Mesa Airlines, Inc.<br><br>Plaintiff,<br><br>v.<br><br>Air Line Pilots Association International,<br><br>Defendant. | No. CV11-2106-PHX-JAT<br><br>**ORDER** |

Currently pending before the Court are Plaintiff's Motion for Summary Judgment (Doc. 20) and Defendant's Motion for Summary Judgment on Defendant's Counterclaim (Doc. 22). The Court now rules on the Motions.

### I.   BACKGROUND

The facts of the case are largely undisputed. First Officer Marcin Kolodziejczk (the "Grievant") worked as a pilot for Plaintiff Mesa Airlines, Inc. ("Mesa") from July 2006 to his termination on August 10, 2010. At the time relevant to this case, the Grievant was acting Vice Chairman of the Mesa Master Executive Council and the second most senior official of Defendant Air Line Pilots Association, International ("ALPA") within the Mesa pilot group. In that position, the Grievant negotiated on behalf of ALPA with Mesa regarding a possible furlough of pilots.

Mesa had announced its intention to furlough an additional 250 pilots. The ALPA negotiating committee was tasked with developing a solution to mitigate the loss of jobs. Mr. David Butler, Mesa's Senior Vice President of Human Resources and an African

1   American, attended a negotiating session on behalf of Mesa also attended by Grievant
2   regarding possible mitigation of furloughs.

3   At the session, Mesa rejected the mitigation proposal submitted by ALPA. After
4   the session, Mr. Butler sent a mass "blast" to the Mesa pilots that ALPA felt
5   misrepresented the negotiations and made it appear that members of the negotiating
6   committee, including Grievant, had "sold out" their fellow pilots. Grievant testified that
7   Mr. Butler's email appalled and sickened him.

8   After receiving Mr. Butler's email, Grievant sent an email on July 3, 2010
9   describing the negotiating session to 17 other ALPA members, some of whom also
10  happened to be Mesa pilots, that read: "He was hanging from the ceiling making monkey
11  sounds. That's all I witnessed at the meeting I was at . . . Stay focused and I already
12  have the chains for him, just need your help to string him up!" Grievant sent the email
13  while off duty from his official ALPA email account to the other ALPA officials and
14  assumed that the email would remain confidential.[1] Grievant reluctantly eventually
15  admitted that this email referred to Mr. Butler.

16  Someone printed off a hard copy of Grievant's email and anonymously left it on
17  Mr. Butler's desk. Mr. Butler turned the e-mail over to Mesa's legal counsel, and Mesa
18  promptly initiated an investigation. When questioned about the email, Grievant
19  dismissed the monkey analogy, claiming that Mesa had created a circus-like atmosphere
20  and that pilots are referred to as switch monkeys. He also claimed not to understand how
21  anyone could perceive his use of the words "chains" and "string him up" as an allusion to
22  lynching.

23  After its investigation into the July 3, 2010 email, Mesa terminated Grievant. The
24  August 10, 2010 termination letter cited the email, Grievant's attempts to explain away

---

[1] Grievant and the other members of the ALPA negotiating team utilized a secure ALPA website for confidential internal Union communications, including email communications about the negotiations. Access to the site and email distributions was limited to 17 ALPA officials who signed a confidentiality agreement requiring them not to reveal the contents of postings on the site.

- 2 -

the email, his apparent lack of understanding regarding the seriousness of the email, an apology email that Mesa believed had been "altered," and Mesa's Employee Handbook's prohibition against harassment and workplace violence as reasons for his termination. Mesa noted in the letter that the offensive email alone was sufficient to warrant immediate termination.

On August 12, 2010, ALPA filed a grievance on behalf of the Grievant. ALPA is the exclusive collective bargaining representative for Mesa pilots. ALPA and Mesa are parties to a collective bargaining agreement (the "CBA").

Section 18 of the CBA sets forth the procedures governing administration of grievances. Section 19 provides the procedures for disciplining or discharging a Mesa pilot. Section 20 of the CBA — by agreement of the parties and as required by the Railway Labor Act ("RLA") — establishes a System Board of Adjustment for purposes of adjusting and deciding disputes that arise under the CBA. Pursuant to Sections 20.M and P of the CBA, pilot discharge cases are heard by a three-member board of adjustment comprised of an ALPA representative, a Mesa representative, and a neutral referee. In Section 20.L, the parties agree that decisions of the System Board shall be final and binding on all parties.

The System Board conducted an evidentiary hearing in Phoenix, Arizona on April 20 and 21, 2011. The neutral referee was Arbitrator Stanley Sergent (the "Arbitrator"). Both ALPA and Mesa presented evidence and cross-examined witnesses at the hearing. Following the hearing, both parties submitted post-hearing briefs on July 25, 2011.

On September 16, 2011, the Arbitrator issued his decision (the "Award"). He found that Mesa failed to establish that Grievant's "email [rose] to the level of harassment or threatening behavior as alleged in the letter of termination." (Doc. 1-3, p.37.) The Arbitrator further determined that Mesa had discharged the Grievant without just cause and ordered Mesa to reinstate Grievant with full seniority and back pay.

Mesa did not reinstate Grievant. It instead filed this action on October 26, 2011 to vacate the Award. Mesa alleges three bases for vacating the Award: 1) the Award

violates public policy because it condones racial harassment; 2) the System Board exceeded its jurisdiction because the Arbitrator ignored the language of the CBA and applied his own brand of industrial justice; and 3) the Arbitrator exhibited bias by ignoring a piece of evidence. Mesa filed its pending Motion for Summary Judgment on May 18, 2012, and ALPA filed its Motion for Summary Judgment on Defendant's Counterclaim on the same day.

## II. LEGAL STANDARD

The scope of review of an arbitrator's labor dispute decision is extremely limited. *Aramark Facility Servs. v. Serv. Emps. Int'l Union, Local 1877, AFL CIO*, 530 F.3d 817, 822-23 (9th Cir. 2008). In fact, review of an adjustment board award under the RLA is "among the narrowest known to the law." *English v. Burlington N.R. Co.*, 18 F.3d 741, 743 (9th Cir. 1994).[2] Congress intended for this narrow review to advance the goal of prompt and final settlement of labor disputes by keeping the disputes within the adjustment board and out of the courts. *United Transp. Union v. Union Pac. R. Co.*, 116 F.3d 430, 432 (9th Cir. 1997). Federal statutes regulating labor-management relations reflect a decided preference for private settlement of labor disputes without intervention by the government. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37 (1987).

In reviewing arbitral awards, courts do not entertain claims of factual or legal error by the arbitrator. *S. California Gas Co. v. Util. Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 792 (9th Cir. 2001). The Court cannot disregard an arbitrator's factual determinations or supplement them with its own factual findings, nor can the Court "correct" an arbitrator's erroneous understanding of the law. *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Assoc. of Machinists and Aerospace Workers*, 886 F.2d 1200, 1207 (9th Cir. 1989)(en banc); *see also S. California*

---

[2]The RLA was extended in 1936 to cover the airline industry and sets up a mandatory arbitral mechanism for handling the industry's grievance disputes. *Hawaiian Airlines v. Norris*, 512 U.S. 246, 248 (1994).

- 4 -

*Gas*, 265 F.3d at 794 ("While the Gas Company may view the Barnes debacle as an easily-correctible, technical deviance from mandated procedures, the arbitrator did not. This is precisely the type of legal conclusion which a court may not disturb."). The Court further must refrain from second-guessing the remedy formulated by the arbitrator and must defer to the arbitrator's use of his informed judgment to reach a fair solution of the problem. *Stead Motors*, 886 F.2d at 1208. Allowing courts to have the final say on the merits of arbitration awards would undermine the federal policy of settling labor disputes by arbitration. *Misco*, 484 U.S. 29 at 36.

The RLA provides three statutory grounds for vacating an arbitration award: 1) failure of the adjust board to comply with the requirements of the RLA; 2) failure of the adjustment board to confine itself to matters within the scope of its jurisdiction; and 3) fraud or corruption of a member of the board. *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978)(citing 45 U.S.C. §153 First(q)). The Court also can vacate an arbitration award if the award violates public policy, although the Court should be reluctant to do so. *S. California Gas*, 265 F.3d at 794-95; *see also Aramark*, 530 F.3d at 823 ("We have stressed that courts should be reluctant to vacate arbitral awards on public policy grounds because the finality of arbitral awards must be preserved if arbitration is to remain a desirable alternative to courtroom litigation.")(internal citations omitted); *United Food & Commercial Workers, Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1996)("Courts should be reluctant to vacate arbitration awards on public policy grounds. As we have explained: The parties to a collective bargaining agreement did not bargain for a court's judgment. They bargained for an arbitrator to tell them what was 'just cause' for discharge and what was not. . . . Neither [party] had the right to believe that it could refuse to honor an arbitrator's award simply because it was disappointed by or disagreed with the result . . ..")(internal citations omitted).

To vacate an arbitration award on public policy grounds, the Court must: 1) find that an explicit, well-defined, and dominant policy exists and 2) that the policy is one that specifically militates against the relief ordered by the arbitrator. *Aramark*, 530 F.3d at

823. The explicit public policy must be rooted in something more than "general considerations of supposed public interests;" the policy must be ascertained by reference to the laws and legal precedents. *Misco*, 484 U.S. at 43. And in evaluating a public policy argument, the Court must focus on the award itself, not the behavior or conduct of the Grievant. *Aramark*, 530 F.3d at 823. The question of whether public policy militates against enforcement of an arbitral award is one for the courts. *Foster Poultry*, 74 F.3d at 174.

In making the public policy inquiry, the Court must take the facts as found by the arbitrator. *Id*. The fact that the Court is deciding whether a possible public policy violation exists does not excuse the Court for doing the arbitrator's task. *Id*. (citing *Int'l Bd. of Elec. Workers, Local 97 v. Niagra Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998)("In reviewing an arbitral award for possible violations of public policy . . . a court is not authorized to revisit or question the fact-finding or the reasoning which produced the award.")).

Before the Court can vacate an award on public policy grounds, the policy violation must be "clearly shown." *Foster Poultry*, 74 F.3d at 174. And the party seeking to vacate the award bears the burden of demonstrating that the award violates public policy. *S. California Gas*, 265 F.3d at 796.

### III. ANALYSIS CONCLUSION

Mesa argues the Court should vacate the Arbitrator's award for three reasons: 1) the System Board exceeded its jurisdiction because the Arbitrator ignored the language of the CBA and applied his own brand of industrial justice; 2) the Arbitrator exhibited bias by ignoring a piece of evidence; and 3) the Award violates public policy because it condones racial harassment. The Court will address each argument in turn.

#### A. Jurisdiction of the Board

Mesa contends that the System Board exceeded its jurisdiction because the Arbitrator failed to apply the terms of the CBA and instead issued an Award without foundation in reason or fact. Mesa argues that the Arbitrator ignored its anti-harassment

policy, which Mesa claims applies to on-duty and off-duty conduct, and ignored the CBA's management rights clause. Mesa further argues that the Arbitrator erred in applying the concepts of progressive discipline because the CBA does not mention progressive discipline.

The Court must confirm the Arbitrator's Award unless the Award does not at least "draw its essence" from the CBA. *Hawaii Teamsters and Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1181 (9th Cir. 2001). The Court reviews the procedural soundness of the Arbitrator's decision, not the substantive merit of the decision. *Id*. If the Arbitrator even arguably construed or applied the CBA, the Court cannot overturn his decision, even if the Court is convinced the Arbitrator committed serious error. *S. California Gas*, 265 F.3d at 792; *see also Misco*, 484 U.S. at 36 ("The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract."). The Court limits its review to whether the Arbitrator's decision was "rationally derived from some plausible theory of the general framework or intent" of the CBA. *Foster Poultry*, 74 F.3d at 173. The Court can vacate the Arbitrator's Award only if the Arbitrator ignored the CBA's plain language and instead dispensed his own brand of industrial justice. *S. California Gas*, 265 F.3d at 792.

In deciding a grievance, an arbitrator is not confined to the express terms of the CBA, but also may consider the "industrial common law," which is equally a part of the CBA. *United Parcel Serv.*, 241 F.3d at 1181. If the express terms of the CBA leave gaps that need to be filled, then the Arbitrator fills those gaps. *Stead Motors*, 886 F.2d at 1205. The Arbitrator serves as the parties' officially designated interpreter of the CBA and their joint alter ego for purposes of handling matters omitted from the CBA. *Id.* Because the Arbitrator functions in essence as the parties' surrogate, "he cannot 'misinterpret' a collective bargaining agreement." *Id*.

The Court finds that the Arbitrator's Award at least arguably construes and applies the CBA. Mesa has not pointed to any express language in the CBA that the Arbitrator's

Award ignored. And the Arbitrator was free to interpret the CBA and supplement the CBA's terms with industrial common law where the CBA was silent on an issue. The Arbitrator therefore did not exceed his jurisdiction by applying the workplace nexus standard or the progressive discipline standard because the CBA does not expressly mention either common industrial concept. Moreover, the Arbitrator did not ignore any express language in Mesa's written anti-discrimination policies. No section cited by Mesa *explicitly* says that the anti-discrimination policy applies to conduct occurring outside the workplace.

The Court cannot review the merits of the Arbitrator's Award or whether he interpreted the CBA correctly. As the Ninth Circuit Court of Appeals has stated, the Arbitrator cannot misinterpret the CBA and, absent fraud or overreaching of authority, his award *is* the parties' agreement. *Id*. Because the Court finds the Award reflects that the Arbitrator did construe the CBA and because the Award "draws its essence" from the CBA, the Court will not vacate the Award on jurisdictional grounds.

### B.    Arbitrator Bias

Mesa argues that the Arbitrator exhibited bias by ignoring a piece of evidence that proved Grievant's email was not an isolated, one-time use of racist language. Although Mesa did not know about it at the time it fired Grievant or at the time of the hearing, Mesa attached a text message to its post-hearing brief in which Grievant referred to a white Mesa pilot as "Negro."

One of the RLA's statutory bases for vacating an arbitration award is fraud or corruption by a member of the adjustment board. *Sheehan*, 439 U.S. at 93. Because of the strong federal policy favoring arbitration, fraud under the RLA requires an extremely high degree of improper conduct. *Pac. & Arctic Ry. and Nav. Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991). Fraud occurs when a "supposedly neutral arbitrator exhibits a *complete* unwillingness to respond, and indifference, to *any* evidence or argument in support of one of the parties' positions." *Id*. (emphasis added).

Although the Arbitrator ultimately decided to reinstate Grievant, the Award

reveals that the Arbitrator carefully reviewed both parties' evidence and arguments. The Arbitrator did not categorically refuse to acknowledge Mesa's arguments or evidence, as required to demonstrate fraud under the RLA.

Mesa bases its argument that the Arbitrator excluded the text message from evidence on the fact the Award does not mention the text message. But RLA arbitration awards are not judicial opinions. *Stead Motors*, 886 F.2d at 1206. Labor arbitrators do not have to make the sort of explicit or exhaustive findings of fact that courts must make, and the reasons for arbitral rulings need not be spelled out in detail. *Id*. Moreover, Mesa has not shown that the Arbitrator had to consider evidence that Mesa did not have before it when it decided to terminate Grievant. *See Misco*, 484 U.S. at 39 ("Nor was it open to the Court of Appeals to refuse to enforce the award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time Cooper was fired.").

Even if the Arbitrator erred in refusing to consider the text message submitted after the hearing, his error was not so severe as to constitute bias or fraud. Mesa clams that the Arbitrator exhibited bias by failing to mention one, solitary piece of evidence. But fraud under the RLA requires more; in this case, it would require that the Arbitrator refused to even consider any of Mesa's evidence or arguments. The Arbitrator did not exhibit that sort of severe bias. The Court therefore will not vacate the Award based on alleged bias and fraud by the Arbitrator.

### C. Public Policy

Mesa asserts that the Award condones racial harassment and therefore violates the public policy against unlawful discrimination. In addressing Mesa's public policy argument, the Court must look at whether the award itself violates defined laws and legal precedent, not whether Grievant's behavior violates public policy.

In reviewing the Award, the Court must not attempt to perform the Arbitrator's job. The Court cannot entertain claims that the Arbitrator committed factual or legal error. *S. California Gas*, 265 F.3d at 792. The Court therefore cannot disregard the

Arbitrator's factual determinations or supplement them with its own factual findings, nor can the Court "correct" the Arbitrator's erroneous understanding of the law. *Stead Motors*, 886 F.2d at 1207. The Court must accept the factual findings and legal reasoning of the Arbitrator and cannot substitute its judgment for the judgment of the Arbitrator because the parties bargained for the Arbitrator to decide the merits of the grievance, not the Court. *Foster Poultry*, 74 F.3d at 174.

The Court agrees with the Arbitrator that Grievant's behavior was inexcusable and that Grievant exercised extremely poor judgment, but the Court also is bound by the Arbitrator's finding that Grievant's conduct did not rise "to the level of harassment or threatening behavior as alleged in the letter of termination" (Doc. 1-3, p.37), even if the Court would have decided the issues differently in the first instance. The Arbitrator determined that Grievant's behavior did not constitute harassment in large part because Grievant sent the email while he was off duty and away from his workplace to a confidential list serve of ALPA members and Mesa did not demonstrate a sufficient nexus between Grievant's conduct and an adverse effect on Mesa's business interests. (Doc. 1-3, p.24 "While the grievant's email may be [stet] have been racist and offensive, [Mesa] does not have the right to govern every action or comment that an employee makes outside of the workplace.")

The Arbitrator further found that Grievant did not intend for Mr. Butler to ever receive the email and that intent is an element of harassment. (Doc. 1-3, p.33 "His comments were never expected nor intended to be delivered for the purpose of harassing Mr. Butler. By its legal definition, harassment requires the element of intent.") Again, even if the Court does not agree with that statement of the law, the Court is not free to "correct" the Arbitrator's erroneous understanding of the law. *Stead Motors*, 886 F.2d at 1207.

The Arbitrator also found that Mesa failed to establish Grievant's email contained any real or legitimate threat because the Grievant clearly never intended to deliver a threatening or harassing message to Mr. Butler. (Doc. 1-3, p.36.) The Arbitrator noted

that Mesa's General Counsel, Chris Pappaioanou, testified that Mr. Butler was not in fear for his safety.

In the conclusion section of the Award, the Arbitrator found that Mesa had not met its burden of proving just cause to terminate Grievant because Mesa failed to establish two key facts: 1) that a workplace nexus existed between the off-duty conduct and an adverse effect on Mesa's business interest and 2) that the email rose to the level of harassment or threatening behavior. (Doc. 1-3, p.37.) In reaching that conclusion, the Arbitrator found that the Employee Handbook sections cited in the termination letter apply only to misconduct that occurs in the workplace and that Mesa did not show that Grievant's conduct, although "undeniably improper," impacted the workplace. (Id.)

Given the Arbitrator's findings outlined above that no workplace harassment occurred, which the Court has to accept, the Court must determine whether reinstatement of Grievant would violate public policy. The Court concludes that it would not.

Public policy, as embodied in Title VII and other laws, indisputably prohibits discrimination in the workplace. But there is no similar law prohibiting private discriminatory statements made outside the workplace, no matter how reprehensible those statements might be. And the Arbitrator found that Grievant's conduct occurred outside the workplace and had no effect on the workplace. Again, the Court cannot reach its own independent findings regarding whether workplace harassment occurred.

Because no law prohibits reinstatement of an employee who makes offensive and racist statements that nonetheless do not constitute workplace harassment, the Court finds that the Award does not violate public policy. The Court reaches this conclusion because of the very narrow scope of review of RLA arbitration awards and despite sharing Mesa's revulsion toward Grievant's racist statements.

The Court has held that the System Board did not exceed its jurisdiction, that the Arbitrator did not demonstrate bias rising to the level of fraud, and that the Award does not violate public policy. The Court therefore will confirm the Award.

Accordingly,

**IT IS ORDERED** DENYING Mesa's Motion for Summary Judgment (Doc. 20).

**IT IS FURTHER ORDERED** GRANTING Defendant's Motion for Summary Judgment on Defendant's Counterclaim (Doc. 22) and CONFIRMING the Arbitrator's Award.

Dated this 14th day of September, 2012.

*/s/ James A. Teilborg*
James A. Teilborg
United States District Judge